[Cite as *State v. Smith*, 2019-Ohio-5264.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-180151 |
| | | TRIAL NOS. B-1507289 |
| Plaintiff-Appellee, | : | B-1601998 |
| vs. | : | *O P I N I O N.* |
| KENT SMITH, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgments Appealed From Are:  Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  December 20, 2019

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Mary Stier*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Kent Smith,* pro se.

**CROUSE, Judge.**

{¶1}     Defendant-appellant Kent Smith committed a string of burglaries, robberies, and felonious assaults in December 2015.  Many of the crimes were violent and caused serious harm to the victims, including a 14-year-old boy who was shot in the chest by Smith, and a victim who suffered physical injuries and emotional distress after being assaulted and robbed by Smith twice in a ten-day period.  Smith was charged with 19 counts in two indictments.  After some of the counts were merged, Smith was convicted of 15 counts and six accompanying firearm specifications.  The trial court then imposed the maximum sentence on each count and firearm specification, and ordered all counts and specifications to run consecutively to each other, for a total sentence of 101 years in prison.

{¶2}     Smith has appealed, arguing in seven assignments of error that (1) several of his convictions were based on insufficient evidence; (2) he was denied due process of law when the trial court failed to give an accomplice jury instruction concerning the testimony of codefendant Michele Brown; (3) he was denied a fair trial and due process when the state solicited false testimony; (4) he was deprived of the effective assistance of counsel; (5) his right to be free from double jeopardy was violated when the trial court instructed the jury to convict him of burglary in counts seven and eight in the case numbered B-1507289; (6) the trial court deprived Smith of his right to counsel by imposing sentences outside of his presence and the presence of his counsel; and (7) the trial court erred by imposing consecutive sentences without making the required findings under R.C. 2929.14(C)(4) to support consecutive sentences.

{¶3} There was insufficient evidence to support Smith's convictions in count two of the case numbered B-1507289A ("B-15") and count nine of the case numbered B-1601998 ("B-16"), and so we sustain Smith's first assignment of error in part, and overrule it in part. We sustain Smith's sixth and seventh assignments of error and remand the cause to the trial court for a new sentencing hearing. We overrule the remainder of Smith's assignments of error and affirm the judgment of the trial court in all other respects.

### *The Duck Creek Apartment Crimes*

{¶4} Smith committed a number of crimes at the same apartment complex on Duck Creek Road. Bitwoded Gebregiorigis lived at the Duck Creek apartments. He was assaulted and robbed twice by Smith. The first assault and robbery occurred on December 8. Gebregiorigis testified that as he approached the front door to his apartment, a man jumped out of the bushes, hit him in the head with a gun, and then stole his ID, credit cards, and $500 before fleeing in a car. At trial, Gebregiorigis testified that a picture of Michele Brown's (Smith's girlfriend and codefendant) car looked like the car in which the robber had fled.

{¶5} The second assault and robbery occurred on December 18. Gebregiorigis was approaching his apartment door when he noticed the lock broken and a light on in his apartment. He started to run away, but a man came out of his apartment, knocked him down, and pulled him into the apartment. He put a gun to Gebregiorigis's head and took $200 and a cell phone. The man's face was uncovered. Gebregiorigis selected Smith's photo from a photo array. He told police that he was 60 percent certain that Smith was the man who robbed him, although his confidence in his identification dipped to 40 percent when he testified at trial. State's exhibit

eight depicted a white Samsung phone recovered from Smith's house after police executed a search warrant. Gebregiorigis identified the white phone in state's exhibit eight as the phone taken from him during the robbery. Also, Detective Joseph Coombs testified that the white Samsung in exhibit eight had Gebregiorigis's SIM card in it.

{¶6} Christopher Fitch also lived at the Duck Creek apartments. He testified that his apartment was burglarized, and that a television, Xbox, chess board with a wooden case, and video games were stolen. Finch identified state's exhibits 26-29 as photographs depicting video games that were stolen from him. The same video games were recovered from Smith's house when police executed a search warrant.

{¶7} Samantha Herchik was another resident of the Duck Creek apartments. She had asked her friend, Penelope Houk, to look after her cat while she was out of town. Houk testified that when she went to Herchik's apartment to check on the cat, she found the apartment had been burglarized. She discovered that Herchik's guitar and some cat supplies were missing.

{¶8} The state alleged that Smith committed his crimes with the assistance of his girlfriend Michele Brown, who was a key witness against Smith at trial. Brown testified that she drove Smith to the apartment complex on Duck Creek Road several times during December 2015 for the purpose of committing robberies and burglaries. She could not remember dates for most of the offenses, but remembered many of the items that were stolen.

{¶9} Brown testified that Smith robbed a man whom Brown described as "Indian," with a "long, weird name." Gebregiorigis testified that he is from Ethiopia.

Brown testified that after she drove Smith to the Duck Creek apartments, Smith went into the apartment after the "Indian guy" and was gone for a couple of minutes. When Smith came back to the car, he told Brown that he had attacked the man as he was walking into his apartment, and took his wallet and cell phone. Brown identified the white Samsung phone in state's exhibit eight as the phone stolen from the "Indian guy."

{¶10} Brown testified that after one of the robberies at the Duck Creek apartments, Smith returned to the car with a television, crock pot, Xbox, and chess board with a wooden case. On another occasion, Smith came back out with "some cat items," a television, and a guitar. As they were leaving the apartments, Brown saw a lady on her balcony taking a photograph of them. Brown identified state's exhibit 41 as a photograph of her and Smith as they were carrying stolen items to her car.

{¶11} Brown testified that after Smith was arrested and police searched his house, Smith asked Brown to go to his house and clean out his room to get rid of items from the burglaries that the police had not found during the search. Brown testified that she got rid of "the Indian guy's wallet, the one with the weird name," along with a chess board and other stolen items.

### Victims Sam Abernathy, Andrew Smith, and Samuel Simpson

{¶12} Samuel Simpson testified that he returned to his home on Marshall Avenue on December 19 after a friend told him his apartment had been broken into. Simpson identified the camera, portable hard drive, computer, and the watches in state's exhibits 53, 57, 58, and 135 as items stolen from his home. Detective Coombs testified that all of those items were recovered during the search of Smith's house.

5

{¶13} Brown testified that on December 19, she drove Smith to a house on Marshall Avenue. Smith went behind the house and returned ten minutes later with stolen items which included a camera and a computer, which she identified in state's exhibits 53 and 58.

{¶14} Sam Abernathy and Andrew Smith lived together on East Eastwood Circle. Andrew testified in his deposition[1] that when he returned home he discovered a large hole in the glass door in the back of the house and glass all over the ground. He testified that two laptops, a hard drive, an AR-15 rifle, and two guitars, among other items, had been stolen from the home. He later found one of the laptops at a pawn shop. He testified that when he turned the laptop on he saw a Google account of Smith's on it. The account included a photo, and during his deposition Andrew identified Smith as the man in the photo on the Google account. Andrew also identified state's exhibits 46 and 48 as the stolen AR-15 and its case. Detective Coombs testified that the AR-15 and case in exhibits 46 and 48 were recovered during the search of Smith's house.

{¶15} Brown testified that she drove Smith to a house on East Eastwood Circle. Smith told Brown that he broke into the house by throwing a spark plug through a glass door in the back of the house. He returned with a long, black case, which Brown identified at trial as state's exhibit 48. After the burglary, Brown became aware that there was a rifle in the case.

### Victims Tony Graves and His Son

{¶16} Tony Graves testified that when he returned home on December 19, his back door had been kicked in. His sons were in the house at the time, but did not

---

[1] Due to living and working out of state, Andrew was permitted to give a deposition pretrial in lieu of testifying at trial.

6

hear anything because they were upstairs wearing headphones. Graves testified that he walked across the street to his aunt's house to see if his aunt or uncle had seen anything. After talking with his aunt and uncle, he started to walk back across the street to his house with his Uncle Luther Gilbert when he ran in to Smith on the street. Smith asked Graves and Gilbert if they had seen anybody run down the street, because, as he claimed, someone had kicked in his mother's door. Then, Smith ran away. Graves drove around the block, but did not see anyone, and so he went back into his house. He was on his phone preparing to call the police when his son came downstairs. His son saw the doorknob twisting on the back door, and reached for it. Graves heard a gunshot and his son scream. He turned around to catch his son as he was falling to the floor with a gunshot wound to his chest.

{¶17} Gilbert testified at trial that shortly before the shooting he was walking his dog and saw a man and a woman arguing in a gray SUV parked in the church parking lot behind Graves's house. When shown a picture of Brown's vehicle, Gilbert identified it as the one he saw in the church parking lot, noting the leopard print steering wheel cover. Gilbert identified Smith as the man who was arguing with the woman in the church parking lot, and as the man who approached him and Graves on the street.

{¶18} Brown testified that she and Smith drove to Graves's house with the intent to steal money from Graves. They parked in a church parking lot directly behind Grave's house. Brown testified that Smith always carried a gun. Smith went to Graves's house with his gun, kicked in the door, but then returned to the car because dogs started barking. While they were sitting in the car, they started arguing because Brown wanted to leave, but Smith wanted to go back to Graves's house to

7

attempt the robbery again. Smith returned to Graves's house, and this time Brown heard a gunshot while he was gone. She drove off, and texted Smith to meet her at a nearby store. Smith met her at the store and got into the car, telling Brown, "I think I popped that n-----," and that he shot through the door of the house. Brown also testified that she remembered a guy walking his dog through the church parking lot while she and Smith were parked there.

{¶19} Brown was questioned by police, and initially stated she had nothing to do with the crimes. She eventually confessed to being involved when the police told her that they had evidence against her. Once Brown was forthcoming with police, she drove around with them and showed them where the crimes occurred.

{¶20} Brown called Smith on a recorded line with detectives listening in. She told Smith that she had talked to police and that they had collected shell casings from the gun used to shoot Graves's son. Smith told her that the shell casings don't come out of the gun he used, and that he had already gotten rid of the gun anyway. Brown also told Smith that police had told her that there were video cameras in the church parking lot, and that she was concerned that the cameras had recorded them. Smith told her that he did not think there were any cameras in the church parking lot, and not to worry.

{¶21} Brown testified regarding text messages sent between her and Smith. When Smith found out that the police had asked Brown to speak with them, he texted her and urged her not to talk. Smith told Brown that the police did not know anything, and that he would give her money for her bills if she did not talk to the police. They also texted about future robberies. In Facebook messages, Smith discussed various items stolen in the burglaries and how to sell them. After Smith

was arrested, Brown and Smith talked over a recorded jail phone line, when Smith mentioned something about "when I shot that dude," but did not name who was shot or when it happened.

{¶22} Brown was arrested for her part in the burglaries, and was detained in the county jail at the time of trial. She testified that while detained, Smith and Smith's father contacted her and told her not to testify. At trial, Brown read several letters from Smith in which he urged her not to testify and told her that the police cannot prove anything. She also read two notes Smith snuck to her in jail in which he again urged her not to testify, and told her that the police do not have enough evidence against them.

### *First Assignment of Error*

{¶23} Smith argues that six of his convictions were based on insufficient evidence. The test for determining whether the evidence was sufficient to sustain a conviction is if "after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). It is a question of law for the court to determine, the court is not to weigh the evidence. *Id.*

1. Count One in B-15—Aggravated Burglary (R.C. 2911.11(A)(2))

{¶24} We do not address Smith's sufficiency challenge to count one of B-15 because Smith does not actually stand convicted of count one due to the fact that count one was merged with count two by the trial court, and Smith was sentenced on count two. *See State v. Cooper,* 1st Dist. Hamilton No. C-180401, 2019-Ohio-2813, ¶

9

15 (where the court merged count three with count two, the defendant was not convicted of count three and so the appellate court did not consider the defendant's sufficiency challenge as to count three).

2. Count Two in B-15—Aggravated Burglary (R.C. 2911.11(A)(1))

{¶25} As charged in the indictment, to convict Smith of aggravated burglary, the state was required to prove that by force, stealth, or deception, he trespassed in an occupied structure when another person other than an accomplice was present, with purpose to commit any criminal offense in the structure, and he inflicted, or attempted or threatened to inflict, physical harm on another. *See* R.C. 2911.11(A)(1).

{¶26} Count two was based upon Smith returning to Graves's house a second time to attempt to steal from Graves. The state argues that Smith committed a trespass when he twisted the doorknob, but it fails to cite any case law in support. In fact, our case law indicates that twisting the doorknob is not sufficient to establish a trespass under R.C. 2911.11. *See In re M.B.,* 1st Dist. Hamilton Nos. C-140405 and C-140406, 2015-Ohio-1912, ¶ 9 (the defendant's conviction for breaking and entering was based upon insufficient evidence where the only evidence presented was that the defendant damaged the door by attempting to pry it open; no evidence was presented indicating that any part of the defendant's body trespassed into the structure).

{¶27} There is no indication that any part of Smith's body trespassed into the house when he returned to the house a second time to attempt to rob Graves. Our decision in *In re M.B.* indicates that merely attempting to gain entry, without actually entering or crossing the threshold, does not satisfy the trespass element of R.C. 2911.11(A). Therefore, we find that the trespass element was not proved as to

count two of B-15. Smith's conviction on count two of B-15 is based upon insufficient evidence.

3. Count Three in B-15—Aggravated Robbery (R.C. 2911.01(A)(1))

**{¶28}** As charged in the indictment, to convict Smith of aggravated robbery, the state was required to show that Smith attempted to commit a theft offense, and displayed, brandished, indicated that he possessed, or used a deadly weapon. *See* R.C. 2911.01(A)(1).

**{¶29}** Smith argues that the state failed to prove that he committed or attempted to commit a theft from Graves. It is undisputed that Smith did not actually commit a theft from Graves. So the state was required to show that he attempted to commit a theft.

**{¶30}** To show an attempt, the state must prove that the offender purposely did or omitted to do something that constituted a substantial step in a "course of conduct planned to culminate in the commission of the crime." *State v. Group,* 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 95. To count as a substantial step, the conduct need not be the last proximate act prior to commission of the offense, but "must be strongly corroborative of the actor's criminal purpose." *State v. Elahee*, 1st Dist. Hamilton No. C-160640, 2017-Ohio-7085, ¶ 16.

**{¶31}** Smith took a substantial step in his attempt to commit theft when he returned to the house after his initial botched robbery attempt with the intent to try again. He then went even further when he attempted to open the door, and shot Graves's son. The testimony from Brown, Graves, and Gilbert, and the recorded phone calls between Brown and Smith, were sufficient evidence for the jury to find Smith guilty of aggravated robbery in count three of B-15.

11

4. Count Six in B-16—Weapon Under Disability (R.C. 2923.13(A)(3))

**{¶32}** Smith argues that an error in the indictment means that the state failed to prove count six in B-16. Count six reads "[Smith] knowingly acquired, had carried, or used a firearm or dangerous ordnance, to wit: a firearm, and at the time the defendant was *under indictment* for a felony offense * * *." (Emphasis added.)

**{¶33}** Smith was not under indictment for a felony, rather the offense which put him under disability was a 2007 conviction for possession of drugs. Since Smith did not object to the defective indictment at trial, he has forfeited all but plain-error review. *State v. Biros*, 78 Ohio St.3d 426, 436, 678 N.E.2d 891 (1997). "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *Id.*

**{¶34}** Smith stipulated at trial to having been under a disability due to the 2007 conviction. He has not shown that the outcome of his trial would have clearly been otherwise had the indictment read that he had been convicted of the 2007 offense instead of being under indictment. Accordingly, there was sufficient evidence to sustain a conviction for count six in B-16.

5. Count Nine in B-16—Burglary (R.C. 2911.12(A)(2))

**{¶35}** Count nine concerned the burglary of Christopher Fitch's apartment. As charged in the indictment, the state was required to prove that Smith, by force, stealth, or deception, trespassed into Fitch's apartment when any person other than an accomplice was present or likely to be present, with the purpose to commit any criminal offense inside. *See* R.C. 2911.12(A)(2). Smith argues that the state failed to prove that someone was present or likely to be present in Fitch's apartment at the time of the burglary. Simply showing that a permanent or temporary habitation has

12

been burglarized does not give rise to the presumption that a person was present or likely to be present. *State v. Wilson,* 58 Ohio St.2d 52, 59, 388 N.E.2d 745 (1979).

{¶36} In a determination of whether a person was present or likely to be present under R.C. 2911.12(A)(2), the question is not whether the offender subjectively believed that someone was likely to be there, but whether it was objectively likely. *State v. Brown*, 1st Dist. Hamilton No. C-980907, 2000 WL 492054, *2 (Apr. 28, 2000).

> The significant inquiry is the probability or improbability of actual occupancy which in fact exists at the time of the offense, determined by all the facts surrounding the occupancy. Merely showing that people dwelled in the residence is insufficient. Instead, the state must adduce specific evidence that the people were present or likely to be present.

*Id.*, quoting *State v. Cravens*, 1st Dist. Hamilton No. C-980526, 1999 WL 567098, *1 (June 25, 1999).

{¶37} When a resident is on vacation when the burglary occurs, courts have looked at the schedule and intention of the resident, specifically circumstances demonstrating whether it was likely that the resident could abruptly return, or another person could have been present. *State v. Cantin*, 132 Ohio App.3d 808, 813-814, 726 N.E.2d 565 (8th Dist.1999). In *Cantin,* the Eighth District found that there was not an objective likelihood that someone would be present in the home at the time it was burglarized. *Id.* at 814. The homeowner had abruptly left town four days before the burglary, had not asked anyone to look after the house while he was gone, and had not given anyone keys to the house. *Id.* at 810.

{¶**38**} On the other hand, where neighbors are given keys to the house and enter periodically to check its condition, there is sufficient evidence that someone is likely to be present. *State v. Gulley*, 1st Dist. Hamilton No. C-850179, 1986 WL 958, *3 (Jan. 22, 1986); *State v. Weber*, 10th Dist. Franklin No. 97APA03-322, 1997 WL 798299, *3 (Dec. 23, 1997).

{¶**39**} Fitch testified that he left for vacation around December 22, and did not return until January 2 or 3, when he discovered the burglary. The exact date of the burglary is unknown. No evidence was presented that anyone but Fitch lived in the apartment, that Fitch had left his key with anyone, or that anyone was allowed to be in the apartment while he was gone.

{¶**40**} The state presented no evidence that someone was likely to be present in Fitch's apartment, and so Smith's conviction for burglary in count nine in B-16 was based upon insufficient evidence.

6. Count Ten in B-16—Burglary (R.C. 2911.12(A)(2))

{¶**41**} Smith makes the same argument about count ten that he did about count nine—that the state presented insufficient evidence that someone was likely to be present at the time the home was burglarized. The victim in count ten, Samantha Herchik, was visiting family for Christmas vacation on the day of the burglary. Herchik had asked her friend, Penelope Houk, to take care of her cat while she was gone. Houk testified that she would go to Herchik's apartment to feed the cat, and that she could stop over "whenever."

{¶**42**} Pursuant to *Gulley, Weber,* and *Cantin,* evidence that Houk had permission to enter the home, and was in fact asked to do so on a regular basis to

14

look after the cat, is sufficient to sustain the jury's finding that someone was likely to be present. Smith's conviction of count ten of B-16 is based upon sufficient evidence.

### Second Assignment of Error

{¶43} Smith argues in his second assignment of error that he was denied due process under the Fourteenth Amendment to the United States Constitution when the trial court failed to give an accomplice jury instruction under R.C. 2923.03(D) concerning the testimony of codefendant Michele Brown.

{¶44} Smith did not object to the jury instructions at trial, and did not request an accomplice instruction. Therefore, he has forfeited all but plain-error review. *State v. Hilliard,* 1st Dist. Hamilton No. C-160263, 2017-Ohio-2952, ¶ 10. Smith must show that an error occurred that affected the outcome of the trial. *See id.* "Notice of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Bandy*, 1st Dist. Hamilton No. C-160402, 2017-Ohio-5593, ¶ 70.

{¶45} Trial courts are required to give a special jury instruction where the defendant is charged with complicity and an accomplice testifies against the defendant. *State v. Hinkston*, 1st Dist. Hamilton No. C-000024, 2000 WL 1434153, *2 (Sept. 29, 2000). Moreover, the Legislative Service Commission notes to R.C. 2923.03 make clear that the accused need not be specifically charged with complicity in order for the instruction to apply ("[i]n charging complicity, the accused may be charged specifically as an accomplice under this section, or he may be charged simply as a joint offender in the offense committed."). *State v. Leonard,* 6th Dist. Lucas No. L-01-1420, 2003-Ohio-3100, ¶ 25.

{¶46} Specifically, the trial court must instruct the jury that:

> The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

R.C. 2923.03(D). The state agrees that an instruction was warranted. However, failure to provide the instruction is not necessarily plain error.

> While R.C. 2923.03(D) does include mandatory language, a legislative mandate does not necessarily prevent a defendant from waiving the failure to give the instruction at all under appropriate circumstances. Unlike instructions that the state has to prove all elements of the offense charged or that a criminal defendant's guilt must be proved beyond a reasonable doubt, instructions that are essential to guarantee due process and for which no other "general instructions" can be substituted, an instruction under R.C. 2923.03(D) depends on the facts of the case and whether the general instructions are sufficient to overcome the failure to give the specific instruction. While it is error not to give the instruction when the facts warrant, failure to provide the specific instruction does not necessarily "create a manifest miscarriage of justice."

*Hinkston* at *2. This court in *Hinkston* held that it was not plain error where the trial court failed to provide the instruction because another witness, the victim,

16

corroborated the testimony of the accomplice by identifying Hinkston as the one who put a gun to his head. *Id.* at *3. The trial court also provided a lengthy instruction on the credibility of witnesses, including an admonition that the jury consider a witness's interest and bias. *Id.*

{¶47} This court held that where the trial court instructs the jury on assessing the credibility of witnesses and where significant evidence other than the accomplice's testimony supports the defendant's conviction, the failure to request or give a jury instruction on accomplice testimony is not plain error. *State v. Wilson*, 1st Dist. Hamilton No. C-970397, 1998 WL 430462, *2 (July 31, 1998). In *Wilson,* the victim identified the defendant and his car, thereby corroborating the accomplice's testimony, and the court instructed the jury on assessing the credibility of witnesses. *Id.* at *1.

{¶48} In the present case, the trial court gave a general instruction to the jury concerning the credibility of witnesses. Brown's testimony as a whole was supported by the recordings of phone calls, text messages, Facebook messages, and letters from Smith. Also, her testimony was corroborated by other witnesses and evidence.

{¶49} Gebregiorigis identified Smith as his assailant and his cell phone was recovered from Smith's house when the police executed their search warrant. The items which Herchik and Houk testified were stolen from Herchik match several of the items Brown remembers Smith stealing during one of the burglaries at the Duck Creek apartments.

{¶50} Several items that were stolen from Simpson were recovered during the search of Smith's house, and were identified by Simpson. The same is true for Abernathy and Andrew. Also, Andrew testified that when he found one of his stolen

laptops at a pawn shop and turned it on, Smith's Google account was signed in. During his deposition, Andrew identified Smith from the profile picture on the Google account.

{¶51} Graves and Gilbert identified Smith as being present near Graves's home at the time of the burglary and the shooting. Gilbert also identified Smith as the man he saw in a car in the church parking lot arguing with a female around the time of the burglary and shooting. Brown's testimony regarding the crimes against Graves and his son was further supported by the recorded phone call with detectives during which Smith made incriminating statements.

{¶52} Defense counsel cross-examined Brown regarding her role in the burglaries and her bias. Brown admitted on cross-examination that she had lied to police initially, and only started to tell the truth when she thought she was going to get into trouble. She also admitted that she kept some of the stolen items for herself, and that she wrote letters to Smith in jail in which she said that she would stay in a relationship with him if he got out.

{¶53} Brown's testimony was corroborated by other evidence, the trial court instructed the jury generally on the credibility of witnesses, and Brown's potential bias was pointed out to the jury during cross-examination. Therefore, although it was error for the trial court to fail to give the accomplice instruction under R.C. 2923.03(D), we cannot say that the outcome of the trial would have clearly been otherwise if the instruction had been given. Smith's second assignment of error is overruled.

### Third Assignment of Error

{¶54} In his third assignment of error, Smith argues that he was denied due process and a fair trial when the state solicited and failed to correct false testimony. It is well-established that a conviction obtained through the use of false evidence violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Napue v. People of State of Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

> The principal prosecution witness at Napue's murder trial was an accomplice then serving a sentence for the crime. He testified, in response to an inquiry by the prosecutor, that he had received no promise of consideration in return for his testimony. In fact, the prosecutor had promised him consideration, but he did nothing to correct the witness' false testimony. This Court held that the failure of the prosecutor to correct the testimony, which he knew to be false, denied Napue due process of law, and that this was so even though the false testimony went only to the credibility of the witness.

*Moore v. Illinois,* 408 U.S. 786, 797, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

{¶55} "The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *State v. Iacona*, 93 Ohio St.3d 83, 97, 752 N.E.2d 937 (2001), quoting *United States v. Lochmondy,* 890 F.2d 817, 822 (6th Cir.1989). The defendant bears the burden of showing that (1) the statement was actually false, (2) the statement was material, and (3) the prosecution knew it was false. *Iacona* at 97.

{¶56} Smith argues that the state solicited false testimony from Detective Coombs, and then emphasized Coombs's false testimony in its closing argument.

{¶57} At trial, Coombs admitted on cross-examination that he did not file charges against Brown in B-16 because she was cooperating. Later, the following exchange occurred between the prosecutor and Coombs:

PROSECUTOR PECK: All right. And on cross we talked about cooperation of Michele Smith – or Michele Brown or Michele Rogers. You haven't made any promises regarding prosecution of her case?

DETECTIVE COOMBS: No, absolutely not. It's not up to me to promise her anything, it's up to the judge what she shall receive.

PROSECUTOR PECK: And she's been locked up the whole time, correct?

DETECTIVE COOMBS: She's been locked up since January 4th of 2016 to currently.

PROSECUTOR PECK: And, to your knowledge, during the pendency of the case, [have] any promises been made with regard to the outcome of her case?

DETECTIVE COOMBS: No.

It is these statements of Coombs that Smith claims are false. In order to demonstrate that Coombs's testimony was false, Smith points to two pretrial hearings during which Brown's cooperation was discussed.

{¶58} At a hearing on May 30, 2017, during which the trial court was considering Brown's request for a reduction in bond, the following exchange occurred:

THE COURT:  You know, how much time are we talking about?  We're working a deal out.

MR. PECK:  For her?

THE COURT:  How much time is she - -

MR. PECK:  Oh yeah, yeah.

MR. GOLDBERG:  We can talk about it because she [doesn't] want to get a promise, she has to be a viable witness.

THE COURT: That's a good idea.

In denying Brown's request for a reduction in bond at the May 30 hearing, the court told Brown,

I know you are cooperating, which is good.  What you did—although you're going to be given consideration, what you did, that's pretty serious because a 14-year-old boy ended up getting shot.

* * *

Depending on your level of cooperation, which has been good so far, if you cooperate during the trial, I know they are going to give you a deal, you know.

{¶59}  During a pretrial hearing on September 18, 2017, Smith requested a continuance.  The court asked the attorneys for both Smith and Brown if they would "waive time" for purposes of the continuance.  The following exchange occurred between the court and Brown's attorney:

THE COURT: And you will all waive time, then?  And your defendant, she's just waiting?

Mr. GOLDBERG: We are okay with it, right.

21

THE COURT: At the trial she's going to be a witness, and as soon as she testifies she was going to get - -

MR. GOLDBERG: Case consideration. We're okay with that.

{**¶60**} Smith contends that Coombs's answer of "no" to the prosecutor's question of whether any promises had been made about the prosecution or outcome of Brown's case was false. However, Smith has presented no evidence that Brown had entered into a plea agreement or was promised a specific sentence in exchange for her testimony. While one could certainly speculate from the discussions at the pretrial hearings that some sort of oral agreement contingent on her trial testimony had already been reached, we cannot hinge our decision on speculation. At most, Smith has shown that Brown's cooperation would be taken into consideration in the negotiation of any future plea agreement and that, in exchange for her cooperation against Smith, Coombs did not file charges against Brown in the B-16 case. Receiving consideration in exchange for testimony is different than being promised a certain outcome. On this record, the evidence is insufficient to conclude that Coombs's testimony was false, even when viewed in light of the statements made during the pretrial hearings.

{**¶61**} Therefore, there was no prosecutorial misconduct for soliciting the statements from Coombs, or discussing Coombs's statements during closing argument. Smith's rights to due process and a fair trial were not infringed. His third assignment of error is overruled.

### *Fourth Assignment of Error*

**{¶62}** In his fourth assignment of error, Smith argues that he received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.

**{¶63}** To establish an ineffective-assistance-of-counsel claim, an appellant must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense, thereby depriving appellant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Debatable trial tactics do not demonstrate deficient performance and "do not constitute a deprivation of the effective assistance of counsel." *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). "A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal,* 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

**{¶64}** Smith argues that defense counsel was ineffective in six ways: (1) by failing to adequately cross-examine Brown about the considerations she received in exchange for her testimony; (2) by failing to object to false testimony and prosecutorial misconduct; (3) by failing to request an accomplice instruction under R.C. 2923.03; (4) for failing to move for the recusal of the judge; (5) for not moving to dismiss various charges because the indictments did not provide adequate notice of the charges against Smith so as to enable him to prepare his defense; and (6) for not moving to have various offenses merged under the Double Jeopardy Clause and R.C. 2941.25(A).

1. Failure to cross-examine Brown about the considerations she received in exchange for her testimony.

{¶65} "The scope of cross-examination clearly falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45.

{¶66} Smith's counsel may have chosen not to cross-examine Brown on the prospect of consideration in exchange for her testimony because, as discussed above, no promises were made to Brown. Also, counsel discredited Brown in other ways by emphasizing her role in the burglaries, her changing stories, and that she only implicated Smith when she thought she would get in trouble. Moreover, counsel cross-examined Detective Coombs about his decision not to charge Brown for the offenses in B-16. Thus, the jury did hear evidence about consideration received by Brown. Accordingly, we find that counsel's decision not to cross-examine Brown about whether she received case consideration was not deficient performance.

2. Failure to object to false testimony and prosecutorial misconduct.

{¶67} As discussed above, Coomb's testimony that no promises were made to Brown in exchange for her testimony was not false. It was not deficient performance for defense counsel not to object to Coombs's testimony or the prosecutor's discussion of Coombs's testimony during closing argument.

3. Failure to request an accomplice instruction under R.C. 2923.03.

{¶68} As discussed above, when the trial court instructs the jury on assessing the credibility of witnesses and when significant evidence other than the accomplice's testimony supports the defendant's conviction, the failure to request or give a jury instruction on accomplice testimony is not plain error. *Wilson,* 1st Dist. Hamilton No. C-970397, 1998 WL 430462, at *2. Although an ineffective-assistance-of-

counsel claim comes with a more lenient standard of prejudice than plain-error analysis, we find that Smith has failed to meet that standard.

{¶69} Demonstrating prejudice on a claim of ineffective assistance of counsel requires appellant to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 146, 538 N.E.2d 373 (1989). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶70} In *Leonard*, 6th Dist. No. L-01-1420, 2003-Ohio-3100, at ¶ 30, the court held that defense counsel's failure to request an accomplice instruction under R.C. 2923.03(D) was ineffective assistance of counsel. But, the codefendant's testimony was uncorroborated and was the only evidence presented that connected the defendant to the crimes. *Id.* at ¶ 3-7. In *State v. Crawford,* 10th Dist. Franklin No. 01AP-1428, 2003-Ohio-1447, ¶ 35, the court held that defense counsel's failure to request an accomplice instruction was ineffective assistance of counsel where the only evidence connecting Crawford to the crime outside of the accomplice's testimony was the victim's testimony, which differed from the accomplice's testimony regarding Crawford's level of culpability.

{¶71} In the present case, the court instructed the jury on the credibility of witnesses generally, defense counsel cross-examined Brown regarding her bias, and Brown's testimony was corroborated by the testimony of other witnesses and the recorded phone calls, messages, and letters between her and Smith. For these reasons, we find that although counsel's failure to request the R.C. 2923.03(D) accomplice instruction may have been deficient performance, Smith has failed to

demonstrate a reasonable probability that requesting the instruction would have changed the outcome of the trial.

4.  Failure to move for the recusal of the trial judge.

**{¶72}** Smith claims that two statements made by the trial judge demonstrated bias and prejudice. First, in the course of denying Brown's request for a reduction in bond during a May 2017 pretrial hearing, the judge said "the stuff she did is pretty serious anyway. Somebody who knowingly set somebody up, somebody is shot, that's serious. I don't like burglaries because it can result in stuff like that. You know I hate burglaries, as everybody knows."

**{¶73}** This statement was not even directed at Smith. Furthermore, it simply demonstrated the judge's personal feeling that burglary is a serious crime, and that that was why he was denying Brown's request for a reduction in bond.

**{¶74}** The second statement occurred during trial, when Smith had informed his counsel that he intended to testify, and counsel had requested a continuance. The following occurred at sidebar:

MS. UNDERWOOD: At this time, I probably need to advise the court that he intends to testify, so I would ask for just a brief recess.

THE COURT: Why? We have to get this case done. We have waited so much. I have been pretty easy, but we got to roll. We got to roll on this. He kind of surprised you a little bit on this one, that's his deal. We have to get going on this case.

MS. UNDERWOOD: Judge, my only concern about that is, I know that this is, you know, last minute, I didn't expect him to testify. And there are

rules about when I can ask questions and when I can't. I don't know if I can ask him any questions at all.

THE COURT: Oh, because he wants to lie about - -

MS. UNDERWOOD: I don't know whether he will or not. And if he does, I need to know what I'm allowed to do, what I'm supposed to do, what I'm allowed to say.

THE COURT: Just real brief recess.

**{¶75}** Smith has failed to show how this statement shows bias or prejudice on the part of the judge. It is clear from counsel's statements that she was concerned about Smith lying under oath. The judge did not demonstrate any bias by simply confirming why counsel was requesting a recess. This becomes even clearer when the court resumed proceedings and the judge again confirmed the reason for the recess. "You need a few minutes to go over what can be presented and what can't be presented. Evidently he wants you to present some testimony you're not sure of, and you want to find out from co-counsel what to do on that, right?"

**{¶76}** The statements made by the judge do not present even an appearance of bias or prejudice. It was not deficient performance for counsel to not move for the recusal of the judge.

5. Failure to move to dismiss charges in the indictment.

**{¶77}** Smith argues that the indictments were insufficient as to several counts because they did not charge the elements of the predicate offenses. He claims that the indictment in B-15 failed to provide him with sufficient notice of the charges against him for counts one and two for aggravated burglary, count three for aggravated robbery, and counts seven and eight for burglary. For B-16, he claims

insufficient notice for count one for aggravated robbery, count four for aggravated burglary, and counts five, nine, and ten for burglary.

**{¶78}** An indictment for aggravated burglary is sufficient where it tracks the language of R.C. 2911.11. *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 31. The indictment need not allege the particular felony that the defendant intended to commit. *Id.* Likewise, an indictment for aggravated robbery that tracks the language of the statute is sufficient. *See State v. Scott*, 2d Dist. Montgomery No. 22745, 2010-Ohio-1919, ¶ 47. The indictment need not name the particular theft offense of which the defendant is suspected. *Id.*

**{¶79}** All counts in both indictments track the language of the relevant statutory provisions and include the essential elements of those offenses. Therefore, the indictments were sufficient to provide Smith with notice of the charges pending against him. It was not deficient performance for Smith's counsel to not file a motion to dismiss the indictments.

6. Failure to move for the merger of various offenses.

**{¶80}** R.C. 2941.25 governs the merger of offenses.

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus

as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25.

{¶81} The Ohio Supreme Court, in *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, N.E.3d 892, clarified the test for when merger is required.

Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if *any one* of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

(Emphasis added.) *Id.* at paragraph three of the syllabus.

{¶82} First, Smith argues that the weapon-while-under-disability charges in count five of B-15 and counts three and six in B-16 were allied offenses of similar import because Smith used the same gun in all three offenses, a gun which Brown testified Smith always carried.

{¶83} Count five of B-15 related to Smith's possession of a gun during the offenses at Graves's house on December 19. Count three of B-16 related to Smith's possession of a gun during the robbery of Gebregiorigis on December 8. Count six in B-16 related to Smith's possession of a gun during the robbery of Gebregiorigis on December 18. The weapon-while-under-disability offenses were all committed separately. Merger would have been improper.

{¶84} Second, Smith argues that his counsel should have sought the merger of counts two, three, and four in B-15. As discussed above, there was insufficient

29

evidence to support Smith's conviction for count two, so we limit our review to counts three and four.

{¶85} Counts three and four involve different victims. Count three charged Smith with aggravated robbery relating to his return to Graves's house to complete the theft. Count four charged Smith with felonious assault for shooting Graves's son through the door of the house. As identified in the indictment, Graves was the victim of the aggravated robbery in count three, and Graves's son was the victim of the felonious assault in count four. Thus, merger of those offenses would have been improper. *See Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at ¶ 26 ("when a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts").

{¶86} Defense counsel's failure to request merger of count five in B-15 and counts three and six in B-16 was not deficient performance. The same applies to counts two, three, and four in B-15.

{¶87} Finding no merit to any of Smith's claims of ineffective assistance of counsel, his fourth assignment of error is overruled.

### *Fifth Assignment of Error*

{¶88} In his fifth assignment of error, Smith argues that the trial court violated his right to be free from double jeopardy when it instructed the jury to convict him of burglary in violation of R.C. 2911.12(A)(3) in counts seven and eight in B-15.

**{¶89}** During trial, the prosecution moved to amend the indictment to reduce the burglary charges in counts seven and eight from R.C. 2911.12(A)(1) burglaries to (A)(3) burglaries. The following exchange occurred:

THE COURT: So on B1507289, on counts 7 and 8, it was an A1 burglary.

He reduced it to an A3 burglaries, Felony 3.

MR. PECK: Yeah.

MS. UNDERWOOD: Okay.

THE COURT: Because he couldn't prove the issue of likely to be present.

MR. PECK: Yeah.

* * *

THE COURT: So they are now straight (A)(3) burglaries. And I'm going

to grant it because it actually benefits the defendant, it reduces them.

**{¶90}** Smith argues that the court's statement that the prosecution could not prove the elements of counts seven and eight as they were charged in the indictment is the equivalent of an acquittal on those counts, and allowing the amended counts to go to the jury subjected him to double jeopardy.

**{¶91}** The Double Jeopardy Clauses of both the Ohio and United States Constitutions prohibit "(1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." *State v. Gustafson,* 76 Ohio St.3d 425, 432, 668 N.E.2d 435 (1996).

**{¶92}** What constitutes an acquittal is determined by analyzing "whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not,

of some or all of the factual elements of the offense charged." *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 571, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977).

**{¶93}** The court may, during trial, amend the indictment, "in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged." Crim.R. 7(D). Amending an indictment to decrease the degree of the offense does not run afoul of Crim.R. 7(D). *State v. Hooks*, 3d Dist. Henry No. 7-15-10, 2016-Ohio-5098, ¶ 20; *State v. Simmons*, 8th Dist. Cuyahoga No. 96208, 2011-Ohio-6074, ¶ 49; *State v. Washington*, 9th Dist. Summit No. 24997, 2010-Ohio-3389, ¶ 12; *State v. Mobus*, 12th Dist. Butler No. 2005-01-004, 2005-Ohio-6164, ¶ 11.

**{¶94}** In the present case, it is clear from the exchange that occurred on the record that the court amended the charges in counts seven and eight to reduce them from R.C. 2911.12(A)(1) burglaries to (A)(3) burglaries per the state's request. The court noted that the reason the state requested to amend the indictment was because the state could not prove that someone was likely to be present in the house. The trial court was permitted to amend the indictment during trial to decrease the degree of the offense, and did not reach "a resolution of the factual elements of the offense." Accordingly, Smith's fifth assignment of error is overruled.

### Sixth Assignment of Error

**{¶95}** In his sixth assignment of error, Smith argues that the trial court violated his due-process rights and his right to counsel when it sentenced him outside his presence or the presence of his counsel in violation of Crim.R. 43(A) and 44(A).

{¶96}   During the sentencing hearing, the court did not state the number of years Smith would receive for counts four and nine in B-16, and the firearm specification for count four.   Rather, the court stated that it was going to impose consecutive sentences and the maximum sentence overall.

{¶97}   The sentencing entry included an 11-year sentence for count four, an eight-year sentence for count nine, and a three-year sentence on the firearm specification for count four.   Because we find that count nine was based on insufficient evidence, we limit our review to count four and its accompanying firearm specification.

{¶98}   An appellate court will not disturb a trial court's felony sentencing decision unless it determines by clear and convincing evidence that the record does not support the trial court's findings, or that the sentence is otherwise contrary to law.   R.C 2953.08(G)(2).

{¶99}   Crim.R. 44(A) requires that for serious offenses defense counsel must be present at all stages of a criminal proceeding from the defendant's initial appearance to his appeal as of right, including sentencing.   In addition, Crim.R. 43(A) requires that the defendant be "physically present at every stage of the criminal proceeding," including sentencing.

{¶100} In *State v. Railey*, 2012-Ohio-4233, 977 N.E.2d 703, ¶ 22 (1st Dist.), this court held that the trial court violated Crim.R. 43(A) where it imposed a 12-month sentence at the hearing, but then modified the sentence to 18 months in the sentencing entry.   "A defendant has a due-process right, embodied in Crim.R. 43(A), to be present when the court imposes sentence, and a trial court cannot abrogate a

defendant's due-process rights by sentencing the defendant in his absence." *Id.* at ¶ 20.

{¶101} In *State v. Gray*, 8th Dist. Cuyahoga No. 83097, 2004-Ohio-1454, ¶ 102, the trial court failed to state at the sentencing hearing the length of the prison term imposed on one of the counts of which the defendant was found guilty, but stated the length of the prison term imposed on that count in the sentencing entry. *Id.* Nevertheless, the Eighth District held that the court's failure to state at the sentencing hearing the length of the term imposed was error, and remanded for a new sentencing hearing. *Id.* In *State v. Skatzes*, 2d Dist. Montgomery No. 15848, 2003-Ohio-516, ¶ 366, the Second District held that the trial court's failure to state at the sentencing hearing the length of the sentence was error.

{¶102} By failing to state at the sentencing hearing the number of years Smith would receive for count four and its accompanying firearm specification, the trial court violated Smith's due-process rights as embodied in Crim.R. 43(A) and 44(A). Therefore, those sentences were contrary to law. Smith's sixth assignment of error is sustained.

### Seventh Assignment of Error

{¶103} Smith argues in his seventh assignment of error that the trial court imposed consecutive sentences without making the findings required by R.C. 2929.14(C)(4).

{¶104} Imposition of consecutive sentences is proper only when the trial court makes the findings required by R.C. 2929.14(C)(4) at the sentencing hearing and incorporates its findings into its sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. No "talismanic incantation" is given to

the words of R.C. 2929.14(C)(4). *Id.* As long as the appellate court can discern that the trial court engaged in the correct analysis and the record contains evidence to support the findings, consecutive sentences should be upheld. *Id.* at ¶ 29.

{¶105} R.C. 2929.14(C)(4) requires the trial court to make three findings before imposing consecutive sentences.

Consecutive service is necessary to protect the public from future crime or to punish the offender and consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶106}** The court made all three of the findings in both of its sentencing entries. At the sentencing hearing, the court made the first finding, stating "I'm also going to impose not only the maximum sentence in this case, but consecutive sentences, because it's to protect the public and to punish the Defendant." But failed to make the second or third finding. The court said nothing about proportionality, nor did it state anything which can be construed as a finding under subsections (a)-(c).

**{¶107}** The findings need not word-for-word match the statutory text, but the court's statements in the present case do not even come close. *See State v. Jackson*, 1st Dist. Hamilton Nos. C-180245 and C-180246, 2019-Ohio-3299, ¶ 32-43.

**{¶108}** Where the trial court fails to make the required findings at the sentencing hearing for consecutive sentences under R.C. 2929.14(C)(4), the proper remedy is remand for a new sentencing hearing. *Id.* at ¶ 44. Smith's seventh assignment of error is sustained.

### *Conclusion*

**{¶109}** Smith's first assignment of error is sustained as to count two in case B-15 and count nine in case B-16, and overruled as to all other counts. Smith's sixth and seventh assignments of error are sustained, and we reverse those portions of the trial court's judgments and remand the cause for the trial court to conduct a new sentencing hearing consistent with the law and this opinion. The remainder of Smith's assignments of error are overruled, and the judgments of the trial court are affirmed in all other respects.

Judgments affirmed in part, reversed in part, and cause remanded.

**MYERS, P.J.,** and **BERGERON, J.,** concur.


Please note:

      The court has recorded its own entry on the date of the release of this opinion.